# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

TAMARA FIELDS                 :
                                    :
and                           :
   :
ESTATE OF LLOYD CARL FIELDS JR.  :
*By and through Tamara Fields as*    :
*Personal Representative*           :
   :
and                           :          Civil Action No. _____
   :
HEATHER CREACH            :
   :
and                           :
   :
ESTATE OF JAMES DAMON CREACH  :
*By and through Heather Creach as*    :
*Personal Representative*           :
   :
and                           :
   :
J. CREACH (1)               :
*By and through his Parent and Guardian* :
*Heather Creach*             :
   :
and                           :
   :
J. CREACH (2)               :
*By and through his Parent and Guardian* :
*Heather Creach*              :
   :
and                           :
   :
REYNALDO GONZALEZ       :
   :
and                           :
   :
KIM COPELAND             :
   :
and                           :

ESTATE OF SEAN COPELAND                     :
*By and through Kim Copeland as*            :
*Personal Representative*                   :
                                            :
and                                         :
                                            :
ESTATE OF BRODIE COPELAND                   :
*By and through Kim Copeland as*            :
*Personal Representative*                   :
                                            :
and                                         :
                                            :
A. TUCKER                                   :
*By and through her Parent and Guardian*    :
*Danelle Sinclair*                          :
                                            :
and                                         :
                                            :
O. TUCKER                                   :
*By and through her Parent and Guardian*    :
*Danelle Sinclair*                          :
                                            :
and                                         :
                                            :
ISABELLA TUCKER                             :
                                            :
       Plaintiffs,   :
                                            :
v.                                          :
                                            :
SYRIAN ARAB REPUBLIC                        :
Damascus, SYRIA                             :
                                            :
       Defendant.    :

## **COMPLAINT**

Plaintiffs Tamara Fields, Estate of Lloyd Carl Fields Jr., Heather Creach, Estate of James Damon Creach, J. Creach (1), J. Creach (2), Reynaldo Gonzalez, Kim Copeland, Estate of Sean Copeland, Estate of Brodie Copeland, A. Tucker, O. Tucker and Isabella Tucker (collectively, "Plaintiffs"), by and through their attorneys, allege the following against Defendant Syrian Arab Republic ("Defendant" or "Syria"):

## NATURE OF ACTION

1.      This action arises out of four terrorist attacks carried out by the Islamic State of Iraq and Syria ("ISIS"), also known as the Islamic State of Iraq and the Levant ("ISIL"), the Islamic State ("IS"), ad-Dawlah al-Islāmiyah fīl-ʿIrāq wash-Shām ("DAESH") and al-Qaeda in Iraq ("AQI"): (1) the November 9, 2015 shooting at the International Police Training Center ("IPTC") in Amman, Jordan (the "Amman Attack"); (2) the November 13, 2015 shooting at La Belle Equipe café in Paris, France (the "Paris Attack"); (3) the July 14, 2016 cargo truck attack in Nice, France (the "Nice Attack"); and (4) the August 17, 2017 van attack on La Rambla in Barcelona, Spain (the "Barcelona Attack").

2.      ISIS carried out these attacks with material support and resources provided by Syria.

3.      Plaintiffs bring this action pursuant to the provisions of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq*. (hereinafter "FSIA").  The U.S. Department of State designated Syria as a State Sponsor of Terrorism in 1979 and it has remained so designated at all times referenced herein.  Through the attacks at issue in this Complaint, ISIS terrorists committed, and Plaintiffs were the victims of, acts of "torture" and "extrajudicial killing" as defined in the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350, and "personal injury" as required by 28 U.S.C. § 1605A, thereby entitling the Plaintiffs, as American victims of Syrian terrorism, to bring this action and recover damages pursuant to applicable law.

**THE PARTIES**

4.     Plaintiff Tamara Fields is a citizen of the United States domiciled in the State of Florida.  Ms. Fields was married to Lloyd Carl Fields, Jr. at the time of his death in the Amman Attack.

5.     Plaintiff the Estate of Lloyd Carl Fields Jr. is represented in this action by and through Tamara Fields, its Personal Representative as appointed under the laws of the State of Florida.  Mr. Fields was, at the time of the acts alleged, and at all other times relevant hereto, a United States citizen domiciled in the State of Florida.  Mr. Fields was, at all times relevant hereto, a victim of "torture" and "extrajudicial killing" as defined in the TVPA, and "personal injury" and "death" as required by 28 U.S.C. § 1605A.

6.     Plaintiff Heather Creach is a citizen of the United States domiciled in the State of Virginia.  Ms. Creach was married to James Damon Creach at the time of his death in the Amman Attack.

7.     Plaintiff the Estate of James Damon Creach is represented in this action by and through Heather Creach, its Personal Representative as appointed under the laws of the State of Florida.  Mr. Creach was, at the time of the acts alleged, and at all other times relevant hereto, a United States citizen domiciled in the State of Florida.  Mr. Creach was, at all times relevant hereto, a victim of "torture" and "extrajudicial killing" as defined in the TVPA, and "personal injury" and "death" as required by 28 U.S.C. § 1605A.

8.     Plaintiff J. Creach (1), a minor represented by his parent and legal guardian Heather Creach, is a citizen of the United States domiciled in the State of Virginia.  He is the son of James Damon Creach.

9.     Plaintiff J. Creach (2), a minor represented by his parent and legal guardian Heather Creach, is a citizen of the United States domiciled in the State of Virginia.  He is the son

of James Damon Creach.

10.     Plaintiff Reynaldo Gonzalez is a resident of the State of Washington.  He is the biological father of decedent Nohemi Gonzalez, a United States citizen, who was killed in the Paris Attack.

11.     Plaintiff Kim Copeland is a citizen of the United States domiciled in the State of Texas.  Ms. Copeland was married to decedent Sean Copeland at the time of his death in the Nice Attack.  She is the mother of decedent Brodie Copeland, another victim of the Nice Attack.

12.     Plaintiff the Estate of Sean Copeland is represented in this action by and through Kim Copeland, its Personal Representative as appointed under the laws of the State of Texas.  Sean Copeland was, at the time of the acts alleged, and at all other times relevant hereto, a United States citizen domiciled in the State of Texas.

13.     Plaintiff the Estate of Brodie Copeland is represented in this action by and through Kim Copeland, its Personal Representative as appointed under the laws of the State of Texas.  Brodie Copeland was, at the time of the acts alleged, and at all other times relevant hereto, a United States citizen domiciled in the State of Texas.

14.     Plaintiff A. Tucker, a minor represented by her parent and legal guardian Danelle Sinclair, is a citizen of the United States domiciled in the State of California.  She is the daughter of decedent Jared Tucker, a victim of the Barcelona Attack.

15.     Plaintiff O. Tucker, a minor represented by her parent and legal guardian Danelle Sinclair, is a citizen of the United States domiciled in the State of California.  She is the daughter of decedent Jared Tucker, a victim of the Barcelona Attack.

16.     Plaintiff Isabella Tucker is a citizen of the United States domiciled in the State of California.   She is the daughter of decedent Jared Tucker, a victim of the Barcelona Attack.

3

17.     Defendant Syrian Arab Republic is a foreign state that was designated in 1979 as a State Sponsor of Terrorism pursuant to section 60 of the Export Administration Act of 1979, 50 U.S.C. App. § 2405, section 620(A) of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371, and section 40 of the Arms Export Control Act, on December 29, 1979, and has remained so designated, continuously, ever since.  Syria has been included on the U.S. State Department's list of State Sponsors of Terrorism longer than any other state.  On December 17, 2004, the United States State Department designated ISIS as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act.  Defendant Syria, at all times pertinent to this action, provided material support and resources to ISIS, enabling it to carry out a murderous campaign of terrorism in different countries across much of the earth.  Syria is and has been a State sponsor of ISIS within the meaning of 28  U.S.C § 1605A and the Flatow Amendment, by providing it with funding, equipment, arms, direction, logistical support, and/or training for its terrorist activities.  In 2001, the United States government placed further sanctions on the Syrian Arab Republic and various leaders of the Syrian government.  President Bashar al-Assad presently rules Syria as a dictator, and has done so continuously since 2000.  President Bashar al-Assad performed acts within the scope of his office which provided material support and sponsorship to ISIS, and caused the personal injuries resulting from the acts of terrorism described herein.  Accordingly, as provided in 28 USC § 1605A(c), Defendant Syria has direct liability for its own acts, and vicariously the liability for the acts of President Bashar al-Assad.  Defendant Syrian Arab Republic is jointly and severally liable to Plaintiffs for their damages resulting from the acts of despicable and heinous terrorism described herein.

## **JURISDICTION AND VENUE**

18.     Jurisdiction over the subject matter of this case arises under 28. U.S.C §§ 1330(a), 1331, 1332(a)(2) and 1605A.

19.     Syria is subject to suit in the courts of the United States as a sponsor of terrorism and for providing material support to and as participants in ISIS' activities pursuant to the FSIA and related statutes.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4), which provides, in pertinent part, that a civil action against a foreign state may be brought in the United States District Court for the District of Columbia.

21.     28 U.S.C. § 1605A(c) provides a federal private right of action against a foreign state that is or was a state sponsor of terrorism, and also against any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, for wrongful death, personal injury, and related torts caused by an act of torture or extrajudicial killing or the provision of material support and resources for such acts.

## FACTUAL ALLEGATIONS

## I.      THE NOVEMBER 9, 2015 SHOOTING AT THE INTERNATIONAL POLICE TRAINING CENTER IN AMMAN, JORDAN

22.     Lloyd Carl Fields, Jr. travelled to Jordan on June 12, 2015 as a government contractor through DynCorp International.  His trip to Jordan was only supposed to last two weeks, but problems with his Israeli work visa kept him there longer.

23.     James Damon Creach arrived in Jordan on October 15, 2015 where he was working through the government contractor DECO, Inc.  Mr. Creach was scheduled to return home to Florida on December 5, 2015.

24.     While in Jordan, Carl and Damon were assigned to the International Police Training Center ("IPTC") in the Muwaqqar district of southeast Amman, Jordan—a facility run and funded in part by the U.S. State Department.  There, they both used their years of experience as police officers to train law enforcement personnel from Jordan, Iraq and the Palestinian

Territories in basic police and security skills.  Carl had previously served as a Deputy Sheriff in

Calcasieu Parish, Louisiana, and as a police advisor in both Iraq and Afghanistan.  Damon was a

graduate of the Virginia Beach Policy Academy, a former police officer in the Virginia Police

Department and had trained police officers in Afghanistan, Kenya and other locations.

25.     Carl and his wife Tamara considered his assignment to Jordan a safe one because

Jordan is a U.S. ally and it has not experienced the levels of terrorism and unrest that have

spread throughout the Middle East in recent years.  Carl's mission appeared so safe, in fact, that

he was not issued a weapon to carry with him.

26.     Damon and his wife Heather also believed that his trip to Jordan did not involve

any great danger.  On the day of the attack in which he was killed, Damon was not armed, he

was not wearing body armor or protective gear, and his vehicle was not armored.

27.     Anwar Abu Zaid was a 28-year old Jordanian police captain studying at the IPTC.

28.     On November 9, 2015, Abu Zaid arrived at the IPTC smuggling a Kalashnikov

assault rifle with 120 bullets and two handguns in his car.  As an officer, he was not searched as

he entered.  After the noontime prayer, Abu Zaid shot at a truck that was moving through the

facility, killing Damon.  Abu Zaid then entered the facility's cafeteria where he killed an

additional four people eating lunch, including Carl.

29.     According to FBI investigators, Zaid did not know either Carl or Damon; he

targeted them simply because they were U.S. citizens.

30.     ISIS claimed responsibility for the attack in a statement issued through their al-

Battar Media Foundation: "Yes . . . we kill the Americans in Amman," the terror group said.  A

few weeks later, ISIS reiterated this claim in its Dabiq Magazine, Issue 12:  "And on '9

November 2015,' Anwar Abu Zeid—after repenting from his former occupation—attacked the

American crusaders and their apostate allies, killing two American crusaders, two Jordanian apostates, and one South African crusader.  These are the deeds of those upon the methodology of the revived Khilāfah.  They will not let its enemies enjoy rest until enemy blood is spilled in revenge for the religion and the Ummah."

31.     According to Israeli military intelligence, Abu Zaid was a graduate of al-Mutah University in al-Karak, Jordan where he was part of a clandestine ISIS terror cell.  That same cell was responsible for a suicide attack near Mosul, Iraq in 2015 and a shooting at the Sarona Market in Tel Aviv, Israel earlier this year.

32.     On the day of the attack killing Carl and Damon, Tamara saw that she missed a call from the U.S. embassy and she knew that something was wrong.  Tamara called back and, when she eventually got through, she was told that Carl had been killed.  The murder of her husband Carl by an ISIS operative has caused her severe mental anguish, extreme emotional pain and suffering, and the loss of her husband's society, companionship, comfort, advice and counsel.  Furthermore, Carl provided substantial financial support to his wife.

33.     That same day, Heather was notified by her husband's company DECO that Damon had been killed.  She later received a call from the U.S. Embassy in Jordan confirming his death.  Heather was then tasked with telling her children that their father was dead.  The murder of their husband and father Damon by an ISIS operative has caused Heather, J.C. (1) and J.C. (2) severe mental anguish, extreme emotional pain and suffering, and the loss of Damon's society, companionship, comfort, advice and counsel.  Furthermore, Damon provided substantial financial support to his wife and sons.

## II.     THE NOVEMBER 13, 2015 SHOOTING AT LA BELLE EQUIPE CAFÉ IN PARIS, FRANCE

34.     In the fall of 2015, Nohemi Gonzalez was a 26-year-old industrial design student

7

at California State University Long Beach spending a semester abroad at the State School of Design in Paris, France.   Described by her friends and family as "bubbly," "happy," and "hard-working," Nohemi was a first-generation Mexican-American born in California.

35.     This was Nohemi's first time living in Europe, and her friends said that she could hardly believe her good fortune to be in Paris to see sights like the Eiffel Tower and the Cathedral of Notre Dame, and to fulfil her dream of studying in the famous city.

36.     On Friday evening, November 13, 2015, Nohemi and a group of friends were out for a night on the town and ended up at La Belle Équipe, a lively Paris bistro on Rue de Charonne.

37.     At approximately 9:36 p.m., as Nohemi and her friends were only a few minutes into their meal, three ISIS operatives, Abdelhamid Abaaoud Abu Umar al-Baljiki, Brahim Abdeslam, and Chakib Akrouh, arrived in a black Seat Leon car, approached the La Belle Equipe café, and began spraying bullets at the diners, killing 19, including Nohemi.

38.     Just a few minutes earlier, Abaaoud, Brahim, and Akrouh had killed a man in a car on Rue Bichat, and then opened fired with their Kalashnikov AK-47 assault rifles at several different establishments:  first, at Le Carillon bar and Le Petit Cambodge on Rue Alibert, killing 15, and injuring 15 others, then at Cafe Bonne Biere and La Casa Nostra pizzeria on Rue de la Fontaine au Roi, killing another five and severely injuring eight.  After the shooting at La Belle Équipe, Abdeslam was dropped off at Le Comptoir Voltaire restaurant where he smiled at the patrons, apologized for interrupting their dinner, and blew himself up.

39.     That same night, members of the same ISIS cell carried out bombings at the Stade de France, killing four, and carried out a mass shooting at the 1,500-seat Bataclan concert hall, killing another 89 people, and injuring at least 99 others.

40.     On November 14, 2015, ISIS issued a written statement in several languages (including Arabic, French, and English) titled "A Statement on the Blessed Onslaught in Paris against the Crusader Nation of France," claiming responsibility for the Paris Attack.

41.     On November 14, 2015, ISIS released an audio message on YouTube claiming responsibility for the Paris Attack.  The voice of the ISIS representative who spoke in the audio message was identified as ISIS member Fabien Clain.

42.     The Bataclan terrorists told their captives lying on the floor that they had been dispatched from Syria by ISIS to carry out the attack to avenge French airstrikes in Iraq and Syria.

43.     Following the Paris Attacks, ISIS also released video testimonials of the perpetrators pledging allegiance to ISIS.

44.     By the end of the Paris Attack, the ISIS terrorists had murdered 130 people and injured nearly 400.

45.     Nohemi was the only American killed in the Paris Attack.  She was a college senior, and would have been the first member of her family to graduate college.

46.     The F.B.I. told Nohemi's family that it would be weeks before her body would be sent back to the United States because of the investigation.  Nohemi's father, Plaintiff Reynaldo Gonzalez, was devastated by the loss of his only daughter.  He suffered, and will continue to suffer, severe psychological and emotional harm, as well as loss of solatium as a result of the terrorist attack that killed Nohemi.

## III.     THE JULY 14, 2016 CARGO TRUCK ATTACK IN NICE, FRANCE

47.     On July 14, 2016, the Copeland family was enjoying their dream vacation in Nice, France, taking in the city's Bastille Day celebrations.  Kim and Sean Copeland, along with their three children Brodie, Austin and Maegan, had all travelled to Europe in order to celebrate

Kim's 40th birthday.  Sean, 51, was a devoted father of three who prided himself on being a "dance dad," a "football dad," and a "baseball dad."   Brodie, 11, was a bright, fun-loving, "one-of-a-kind kid," with aspirations of becoming a professional baseball player, a Hollywood actor and U.S. President.  Brodie was Kim's only biological child.

48.     Days earlier, the family had been in Pamplona, Spain, where Sean and Austin ran with the bulls.  According to Austin, after running 200 yards his dad was the happiest he'd ever seen him.  "This was his moment.  I would never forget the joy on his face that day."

49.     After leaving Spain, the Copeland family traveled together to France.  Missing home, they spent their last hours in France together at a Hard Rock Café.  After a family dinner of burgers and beers, the family headed to the Promenade des Anglais along the Mediterranean Sea with 30,000 others to take in the Bastille Day celebrations, music and fireworks.

50.     At approximately 10:00 PM, shortly after the fireworks, ISIS operative Mohamed Lahouaiej Bouhlel drove a 19-ton refrigeration truck through police barriers and onto the crowded Promenade des Anglais, which had been closed off to all traffic.  Bouhlel carried an automatic pistol, bullets, a fake automatic pistol, and two replica assault rifles (an M16 machine gun and a Kalashnikov), as well as an empty grenade.

51.     Bouhlel started running over people slowly, until two police officers opened fire, at which point he accelerated at full speed towards the dense crowd.  Witnesses described the sounds of the truck hitting people "like empty thuds," as Bouhlel reached an estimated 56 miles per hour, surging through a sea of people.  Bouhel zigzagged through the crowd for over a mile, aiming for as many people as possible.

52.     A witness on a motorcycle attempted to overtake Bouhlel's truck and even tried to open the driver's door, but was unsuccessful.  Bouhlel then began shooting through the cab

window at police officers, firing several times on three police officers close to the Hotel

Negresco.  Bouhlel was screaming out "Allahu Akbar" throughout the attack.

53.     The truck finally came to a halt near Nice's Palais de la Mediterranée, a hotel

adjacent to the beach, and Bouhlel continued to fire at police with his handgun.  Two police

officers fired repeatedly at the cabin of the truck and Bouhlel was killed.

54.     Two days after the Nice Attack, on July 16, 2016, ISIS issued a statement in its

AMAQ publication claiming responsibility and describing Bouhlel as a "soldier of the Islamic

State."  The statement read, "Executor of the deadly operation in Nice, France was a solider of

the Islamic State.  He executed the operation in response to calls to target citizens of coalition

nations, which fight the Islamic State."

55.     In the fifteenth issue of ISIS's propaganda magazine *Dabiq*, ISIS again boasted

about the Nice Attack, listing Bouhlel among the "soldiers of the Caliphate" who has "succeeded

in expanding the territory of the Caliphate, or terrorizing, massacring, and humiliating the

enemies of Allah."  Citing Bouhlel's attack as an operation that "the Islamic State has

conducted," ISIS praised the Nice Attack as an action "in response to the Islamic State's calls to

target nations participating in the Crusader coalition fighting the Caliphate."

56.     Authorities believe Bouhlel carefully plotted and planned his attack for up to a

year with accomplices and ISIS operatives.

57.     Bouhlel's 1.5-mile terrorist attack killed 86 people, injuring an additional 434.

58.     Among those killed were Sean and Brodie Copeland.  Kim, Austin and Maegan

only survived the attack because Sean heroically warned them as the truck careened towards the

family.  Kim was devastated by the loss of her husband.  She suffered and will continue to suffer

severe psychological and emotional harm, as well as loss of consortium as a result of the terrorist

attack that killed Sean.  Furthermore, Sean provided substantial financial support to his wife.

## IV.    THE AUGUST 17, 2017 VAN ATTACK ON LA RAMBLA IN BARCELONA, SPAIN

59.    Jared Tucker, 42 years old, was a devoted father to three girls.  On August 17, 2017, Jared was in Barcelona on vacation.  On his way to a local beach, he stopped for sangria at a café on La Rambla, a crowded pedestrian mall popular with tourists.

60.    Minutes later, ISIS operative Younes Abouyaaqoub drove a three-ton van into the dense crowds on La Rambla, reaching speeds of up to 50 miles per hour.   Abouyaaqoub zigzagged through the sea of people, deliberately aiming to run over and kill as many as possible.  After 500 meters, the van finally came to a halt after hitting a newspaper kiosk, stopping at the famous Joan Míro mosaic.  Abouyaaqoub, wearing a fake explosive belt and carrying numerous knives, exited the van and blended in with the crowd, escaping.  Utilizing ISIS connections and safe houses, Abouyaaqoub evaded arrest for four days until he was found and killed by authorities.

61.    Among the 13 killed on La Rambla was Jared Tucker.  Another 130 were injured.

62.    The next day, on August 18, 2017, ISIS issued a statement claiming direct responsibility for the Barcelona Attack, describing Abouyaaqoub and others supporting him as "soldiers of the Islamic State."  The statement was published by the news agency AMAQ, which is frequently used and supported by ISIS.  The statement read, "the perpetrators of the attack in Barcelona are Islamic State soldiers and carried out the operation on command of Khilafah of targeting coalition countries."

63.    ISIS has claimed responsibility for the Barcelona attack repeatedly since that time, including in its propaganda magazine, *Rumiyah*, and in videos featuring and praising Abouyaaqoub.

64.     Plaintiffs A. Tucker, O. Tucker, and Isabella Tucker, Jared Tucker's daughters, were devastated by the loss of their beloved father.  They suffered and will continue to suffer severe psychological and emotional harm, as well as loss of consortium as a result of the terrorist attack that killed Jared Tucker.  Jared Tucker also provided each of his daughters with substantial financial support.

## V.     SYRIA'S SPONSORSHIP OF AND PROVISION OF MATERIAL SUPPORT AND RESOURCES TO ISLAMIC STATE

65.     Defendant's sponsorship of, and provision of material support and resources to, ISIS must be understood in terms of the totalitarian nature of the Syrian regime, and in the context of Syria's long, storied and sordid history of employing terrorism as a tool for advancing its domestic and international agendas.

66.     The Syrian Arab Republic is a republic in name only.  In reality, it is a dictatorship and police state that strategically exhibits only the external forms of a democratic regime.

67.     Until a February 2012 referendum, its constitution vested one particular party—the Arab Socialist Ba'ath Party—with leadership functions in the State and society.

68.     Despite the constitutional referendum, the President still has the power to issue laws, and, since 1963, an Emergency Law has been in force that suspends most constitutional protections for Syrians.  The President controls the legislative process, emboldened with dictatorial powers.

69.     In 1966, Syrian Ba'athists conducted a coup d'état.  The Ba'athists eliminated all political parties in opposition.

70.     Hafez al-Assad, the now deceased father of the current President of the Syrian Arab Republic, was appointed Minister of Defense in approximately 1966.

71.     Hafez al-Assad led another coup in 1970, in which the Ba'ath party was purged of internal opposition, its leaders were jailed, and Hafez al-Assad was installed as President of the police state.

72.     The al-Assad family has controlled the Syrian regime without interruption since 1971.

73.     Hafez al-Assad had a three-decade Presidency, lasting from 1971 to 2000, in which he was confirmed President in unopposed referenda five consecutive times.

74.     He was succeeded by his son Bashar al-Assad in 2000.  Bashar al-Assad was confirmed as President, leader of the Ba'ath Party and leader of the Army, for a 7-year term, by an unopposed referendum held in 2001 in which he claimed 97.2% of the vote.

75.     He was re-appointed in another unopposed referendum in 2007, this time claiming 97.6% of the vote.

76.     In 2014, Bashar al-Assad was reelected to a third 7-year term, claiming 88.7% of the vote with polling only allowed in government-held territory.

77.     Members of President al-Assad's own minority sect, the Al-Awali clan, control most key positions in the Syrian military and Syrian intelligence and security services.

78.     The Ba'ath Party is heavily influenced by the Syrian military and Syrian intelligence and security services, the latter consuming a large share of Syria's economic resources.

79.     The President and his senior aides in the Syrian military and Syrian intelligence and security services make most important decisions in Syrian political and economic life.

80.     There are more than a dozen security services in Syria, some overlapping in their domains, to make sure that the whole of Syrian territory is covered.  These security services

14

answer directly to President Bashar al-Assad and his brother General Maher al-Assad, commander of the Syrian Republican Guard.

81.     Syria is a dictatorship.  It is clear that support for ISIS from Syrian territory and/or Syrian government actors, on the scale required to facilitate ISIS, could not have been accomplished without the explicit authorization of the Syrian government and Syrian Military Intelligence through President al-Assad.  Syria's own Foreign Minister once publicly admitted, with reference to terrorist attacks carried out by the Abu Nidal Organization with Syrian material support and sponsorship, "Whoever knows my government must realize that such attacks could not be carried out without its awareness."

82.     A U.S. Department of State Bulletin published in 1987 states: "Available evidence indicates that Syria prefers to support groups whose activities are generally in line with Syrian objectives rather than to select targets or control operations itself.  Damascus utilizes these groups to attack or intimidate enemies and opponents and to exert its influence in the region.  Yet at the same time, it can disavow knowledge of their operations.  Such Syrian-supported groups have carried out scores of attacks against Palestinian and other Arab, Turkish, Israeli, and Western targets.  The Bulletin lists many examples of Syrian sponsorship of terrorism and terrorist organizations.  A sampling of these include the following terror attacks:

i.    The suicide truck bombing of U.S. Marine barracks in Beirut, Lebanon, on October 23, 1983, in which 299 American and French servicemen were killed, an operation attributed by then U.S. Secretary of Defense Caspar Weinberger to "basically Iranians with sponsorship and knowledge and authority of the Syrian government";

ii.   The July 1985 assassination of Jordanian diplomat Ziad Sati in Ankara, Turkey.

Turkish authorities issued an arrest warrant for the Syrian Embassy Second Secretary, Mohammed Darwichi.  The chief defendant in the trial, who was employed as a translator in the Jordanian embassy, carried a Syrian passport. During the trial, he confessed to having worked for Syrian intelligence, stating that his control officer was a Syrian diplomat in Turkey who had given the order to assassinate Sati;

iii.  The hijacking of Egypt Air Flight 648 on November 23, 1985, where this Court has found the Syrian Arab Republic liable for its sponsorship and support of terror;

iv.  The simultaneous massacres of air passengers at the TWA and El Al ticket counters at the Fiumicino Airport in Rome, Italy, where this Court has found the Syrian Arab Republic liable for its sponsorship and support of terror; and the Schwechat Airport in Vienna, Austria, which said Rome and Vienna Airport Attacks were committed by Abu Nidal terrorists, with the support and aid of Syria, on December 27, 1985;

v.  The March 29, 1986 bombing of the German-Arab Friendship Union in West Berlin, injuring 11 persons, which, according to the sworn statement of one  of the convicted terrorists, Amad Hasi, was carried out using a bomb that he picked up at the Syrian Embassy in East Berlin from a Syrian Air Force intelligence officer;

vi.  The attempted bombing of El Al Flight 016 on April 17, 1986, which, according to the confession that convicted Jordanian terrorist Nezar al-Hindawi, the brother of Ahmad Hasi, made to British police, was planned with the help of Syrian

16

military intelligence officers (including *inter alia* the Chief of Syrian Air Force Intelligence Brigadier General Nuhammad al-Khuli, one of President Hafez al-Assad's closest aides), and the Syrian Ambassador in London, who supplied him with a Syrian passport, $12,000 in funding, Semtex explosives which he planted in the luggage of his pregnant Irish fiancée and a disguise as a Syrian Arab Airlines crew member;

vii.    The attempted bombing of an El Al plane on June 26, 1986, in Madrid, Spain, by a Spanish member of the Syrian sponsored Abu Musa terrorist organization, carrying a Syrian passport; and

viii.   Support, sponsorship and safe haven of the Abu Nidal Organization, the Abu Musa Group, the Popular Front for the Liberation of Palestine, the Japanese Red Army, the Kurdish Labor Party, the Armenian Secret Army for the Liberation of Armenia, the Lebanese Armed Revolutionary Faction, among other terrorist organizations.

83.     In addition, Syria has provided material support and sponsorship to HAMAS, Hezbollah, Palestinian Islamic Jihad, Zarqawi and AQI, ISIS, among other terrorist organizations and terrorists.

84.     For most of the last ten years, ISIS occupied a large portion of eastern Syria and western Iraq, having established its headquarters in Raqqa, Syria.  Significantly, there are vast oil fields in the areas under its control from which ISIS is able to drill and collect gas and oil.

85.     ISIS's gas and oil sales, including to the Syrian Arab Republic, have become its largest source of money, surpassing travel tolls, private donations, and all other sources of revenue, allowing ISIS to maintain control of its so-called "caliphate."

17

86.     Syria knowingly purchases oil from ISIS as part of its close economic cooperation with The Islamic State.  Oil and gas sales are ISIS' largest source of funds with the vast majority of its oil sales to the Syrian government and private Iraqi buyers.  As of 2014, sales to Syrian and Iraqi buyers, including Bashar al-Assad's government, accounted for $1 million in revenues for ISIS per day.

87.     In addition to economically supporting ISIS, the regime uses ISIS to further its political agenda - as it has historically used other designated terrorist organizations.  By pursuing policies that help ISIS maintain control and bolster its forces, Syria has attempted to gain support of western governments.

88.     In 2011, Syria emptied its prisons of Islamist prisoners with the intention of Islamacizing and militarizing what had been a peaceful uprising against the repressive Alawite minority that Bashar al-Assad heads.  By Islamacizing and militarizing the protestors, the regime forced western countries to support the war against extremists while the government focused its efforts on fighting the more moderate rebels.

89.     The Syrian regime has also enabled ISIS soldiers, allowing them to occupy Syrian cities.  While ISIS made territorial gains, the Syrian regime bombarded rebel-held suburbs such as those around Damascus and Aleppo.

90.     It is well known that ISIS' headquarters are in Raqqa, Syria, where, according to the U.S. Department of State, ISIS plots most of its external operations, including but not limited to the 2016 Brussels Airport attack.  Yet there have been no attempts by the Syrian government forces to expel the terrorists from the surrounding regions with the exception of Palmyra, which the Assad regime temporarily re-occupied with the support of Russia through minimal fighting.

91.     Instead of fighting the extremists, the regime has engaged in a civil war against

what were peaceful protestors while a U.S. led coalition hunts ISIS.

92.     The U.S. Department of State, in its 2015 Country Reports on Terrorism, found that Syria continues to embrace terrorism as an instrument of policy.

93.     The report further noted that ISIS operatives who helped carry out attacks all over the world remain at large in Syria despite being wanted by neighboring and western governments.

94.     The report also expresses concerns about the proliferation of weapons that Syria has been giving to FTOs.

95.     Additionally, it states that the Syrian government has created an environment which encourages terrorist recruits to come to Syria and enables FTOs, specifically ISIS, to plot external attacks without fear of being stopped or imprisoned.

96.     Syria has been continuously designated as a State Sponsor of Terrorism since 1979 and has continued to sponsor designated FTOs in an unrepentant and unapologetic manner, intentionally providing material support, logistics, safe haven, aid and assistance to those who maim and kill innocent American citizens and others through acts of terrorism.

97.     The provision of material support and resources to The Islamic State, a known and designated FTO, by the Syrian government, acting directly and by and through individual governmental leaders, representatives and instrumentalities as named in this Complaint, constitute violations of applicable and numerous United States laws, thereby rendering the Syrian government, liable for its illegal acts and deeds.

## COUNT I
## 28 U.S.C. § 1605A(c), PRIVATE RIGHT OF ACTION

98.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

99.     The Syrian Arab Republic was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i).  Defendant and its agents were acting within the scope of their office, employment, or agency in committing the acts alleged herein.

100.     As a direct and proximate result of the willful, wrongful, intentional, reckless and heinous acts of ISIS members, whose acts were funded and supported by the Syrian Arab Republic and it agents, Plaintiffs suffered, *inter alia*, physical pain and suffering, mental anguish, emotional pain and suffering, solatium damages and/or economic losses resulting from Defendant's acts.

101.     Pursuant to 28 U.S.C. § 1605A(c), Plaintiffs, each of whom are U.S. nationals may assert a cause of action against Defendant for their personal injuries, including but not limited to, their physical pain and suffering, mental anguish, emotional pain and suffering, solatium damages and/or economic losses that were caused by the provision of material support or resources for such an act performed or provided by an official, employee, or agent of Defendant while acting within the scope of his or her office, employment, or agency.

102.     Accordingly, as a result of Defendant's actions, Plaintiffs seek compensatory damages.

103.     WHEREFORE, Plaintiffs demand that judgment be entered against Defendant in such amounts as are permitted by law and in accordance with this Court's prior determinations of awards and Judgments on behalf of similarly situated Plaintiffs for their compensatory damages, and otherwise as permitted by this Court.

### COUNT II
### LOSS OF SOLATIUM

104.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

105.     As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of Defendant, Plaintiffs suffered extreme mental anguish, emotional pain and suffering, and the loss of the society and companionship of the victims.

106.     Accordingly, Plaintiffs bring claims for loss of solatium against Defendant pursuant to 28 U.S.C. § 1605A(c), or, in the alternative, the laws of the District of Columbia.

107.     WHEREFORE, the individual Plaintiffs demand that judgment be entered against the Defendant in an amount to be proven for their compensatory damages, and otherwise as permitted under applicable law by this Court.

### COUNT III
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

108.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

109.     The terrorist attacks described herein constitute extreme and outrageous conduct on the part of ISIS members, whose acts were intended to cause the infliction of physical and emotional harm and distress upon the injured and killed victims, and their families, and were funded and supported by the Syrian Arab Republic.

110.     As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of ISIS members, whose acts were funded and supported by the Syrian Arab Republic, Plaintiffs suffered severe emotional distress, entitling them to compensatory damages.

111.     WHEREFORE, Plaintiffs demand that judgment be entered against the Defendant in an amount to be proven for their compensatory damages, and otherwise as permitted by this Court.

### COUNT IV
### PUNITIVE DAMAGES

112.     Plaintiffs repeat and re-allege each and every allegation of the foregoing

21

paragraphs as if fully set forth herein.

113. As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of Defendant, each of the Plaintiffs suffered extreme mental anguish, emotional pain and suffering, and the loss of the society and companionship and solatium as a result of their family member being injured in the terrorist attacks described herein.

114. Under 28 U.S.C. §1605A and/or state and foreign law, Plaintiffs are entitled to an award of punitive damages to be assessed and awarded against the Defendant for its heinous, reprehensible and unforgiving conduct in perpetrating unrelenting terror upon the United States of America, her citizens, and Plaintiffs.

115. The purpose of punitive damages is to punish, for retribution and to deter further acts of terror by the Defendant and other terror organizations and those who provide material support for the sponsorship of terror. This allows, and under the circumstances requires, a message to be sent by this Court to the Syrian Arab Republic that its past and ongoing sponsorship of terror will not be countenanced by this Court nor by the United States of America. An award of not less than one billion dollars in punitive damages should be assessed against the Defendant, and Judgment should be entered on behalf of the Plaintiffs, and each of them, in such amount of punitive damages, to be shared among them in direct proportion to the other damages awarded to each of the Plaintiffs, and as the interests of justice may allow.

116. WHEREFORE Plaintiffs demand that judgment be entered for punitive damages, jointly and severally, against Defendant, in the amount of $1 BILLION DOLLARS ($1,000,000,000).

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs, pray that the Court:

1. Grant Plaintiffs judgment in their favor against Defendant on Counts I through IV;

2.  Award each Plaintiff compensatory damages against Defendant, the Syrian Arab Republic in the amount to be proven;

3.  Award each Plaintiff solatium damages against Defendant, the Syrian Arab Republic, in the amount to be proven;

4.  Award each Plaintiff punitive damages against Defendant, the Syrian Arab Republic, in the amount of ONE BILLION DOLLARS ($1,000,000,000);

5.  Award each Plaintiff pre-judgment interest as allowed by law;

6.  Award each Plaintiff reasonable costs and expenses;

7.  Award each Plaintiff reasonable attorneys' fees; and

8.  Issue such other and further relief which the Court may determine to be just and equitable under the circumstances and as permitted under applicable law for the heinous acts of terror committed and/or supported by the Defendant.

Dated: June 18, 2018                           Respectfully submitted,

**BURSOR & FISHER, P.A**.

By: _____*/s/ Joshua D. Arisohn*_____
             Joshua D. Arisohn

Joshua D. Arisohn
888 Seventh Avenue
New York, NY 10019
Telephone: (212) 989-9113
Facsimile: (212) 989-9163
Email: jarisohn@bursor.com

**EXCOLO LAW, PLLC**
Keith Altman (*To Be Admitted Pro Hac Vice*)
26700 Lahser Road, Suite 401
Southfield, MI 48033
Telephone: (516) 456-5885
Email: kaltman@lawampmmt.com

23

*Attorneys for Plaintiffs*