## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **TAMARA FIELDS,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | |
| | ) | **Civil Case No. 18-1437 (RJL)** |
| **SYRIAN ARAB REPUBLIC,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION
September **29**, 2021 [Dkt. # 16]

Plaintiffs, the family members and estates of five victims of international terrorist attacks, are suing the Syrian Arab Republic ("Syria") under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*, for damages arising out of Syria's support of the Islamic State of Iraq and al-Sham ("ISIS"). *See generally* Compl. [Dkt. # 1]. Syria has not appeared to defend its conduct, and this matter is now before the Court on plaintiffs' Motion for Default Judgment. Pls.' Mot. for Default J. ("Pls.' Mot.") [Dkt. # 16]. Upon consideration of the materials before the Court and the entire record herein, plaintiffs' Motion for Default Judgment is **GRANTED**.

### FINDINGS OF FACT

Plaintiffs' claims arise from four terrorist attacks carried out in Jordan, France, and Spain. Plaintiffs allege that the terrorist organization ISIS executed these attacks and that the defendant—Syria—provided material support to ISIS. Based on the documentary

evidence comprising the record in this case, including affidavits and expert reports submitted with plaintiffs' motion, the Court makes the following findings of fact.

## A. The Amman Attack

After noontime prayers on November 9, 2015, Jordanian police captain Anwar Abu Zeid—a trainer at the International Police Training Academy in Amman, Jordan—opened fire on attendees and employees of the academy with a Kalashnikov rifle and two pistols. Report by Dr. Daveed Gartenstein-Ross ("Gartenstein Report")[1] at 55.  Before a police sniper killed Abu Zeid, he shot and killed American contractors James Damon Creach and Lloyd Fields, Jr.  *Id.*; *see also* Declaration of Tamara Fields ("Fields Decl.") at ¶¶ 5–6 [Dkt. # 16-5]; Declaration of Heather Creach ("Creach Decl.") at ¶ 7 [Dkt. # 16-6].

Nine days later, ISIS officially claimed responsibility for the attack through their online magazine *Dabiq*, which celebrated the death of "American crusaders and their apostate allies[.]"  Gartenstein Report at 55.  Dr. Gartenstein-Ross authenticated the credibility of that issue of *Dabiq* by comparing it to prior and subsequent issues.  *Id.* at 55–57.  Further, Dr. Gartenstein-Ross analyzed and confirmed ISIS's link to *Dabiq* by

---

[1] Dr. Gartenstein-Ross is the Chief Executive Officer of Valens Global, a private commercial firm focused on analyzing violent non-state actors.  Gartenstein Report at 1. He holds a Ph.D. and M.A. in World Politics from the Catholic University of America, as well as a J.D. from the New York University School of Law.  *Id.* at 2.  He has a robust background in studying and publishing articles on the Zarqawi organization and has been accepted as an expert on Syria's support of ISIS in other federal courts.  *See Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 193 n.4 (D.D.C. 2017) (Kollar-Kotelly, J.); *see also United States v. Young*, 916 F.3d 368, 380 (4th Cir. 2019) (noting that the district court "reached a reasonable decision in qualifying Dr. Gartenstein-Ross based on his extensive credentials and areas of expertise").  As such, I find that Dr. Gartenstein-Ross is qualified as an expert in Syria's relationship with and support of ISIS.

assessing the magazine's connections to known ISIS entities and personnel, as well as content that would have been accessible only to members of ISIS. *Id.* at 57–58. Based on Dr. Gartenstein-Ross's reasonable methodology, I agree with his conclusion that the statement in *Dabiq* was an authentic statement made by an ISIS-controlled magazine. Further supporting ISIS's claim, Abu Zeid began consuming ISIS propaganda in the months before the attack and made comments that indicated that he had adopted pro-jihadist views. *Id.* at 58.[2]

Plaintiffs Tamara Fields, Estate of Lloyd Carl Fields Jr., Heather Creach, Estate of James Damon Creach, J. Creach (1), and J. Creach (2) seek damages stemming from the deaths of Lloyd Carl Fields Jr. and James Damon Creach in this attack. Compl. ¶¶ 4–9.

### B.   The Paris Attack

On November 13, 2015, a cell of ISIS operatives waged "urban warfare" style attacks across Paris. Gartenstein Report at 60. A team of attackers shot patrons at multiple restaurants and cafes before several of the gunmen detonated suicide vests. *Id.* Among the dozens of victims was American student Nohemi Gonzalez, who was dining at La Belle Equipe. *Id.*; *see also* Declaration of Reynaldo Gonzalez at ¶ 6 ("Gonzalez Decl.") [Dkt. 16-7]. Other teams of attackers killed 90 people inside the Bataclan theatre and detonated suicide vests at the Stade de France. Gartenstein Report at 60.

---

[2] To be sure, Dr. Gartenstein-Ross explains that Jordanian officials denied any connection between Abu Zeid and terrorist groups. *Id.* at 59. But Dr. Gartenstein-Ross notes that Jordanian officials had an interest in downplaying any link between the attack and ISIS to portray the nation as "safe from the threat of terrorist attacks" in order to further both national security and tourism interests. *Id.* Thus, I am not troubled by the Jordanian government's statement.

The next day, ISIS claimed responsibility for the attack by releasing a communique posted on various social media messaging applications. *Id.* I again agree with Dr. Gartenstein-Ross's authentication of ISIS's claim of responsibility based on his analysis of unique features that tie the communique to ISIS. *Id.* at 61–63. ISIS also repeatedly issued propaganda taking responsibility for the attack. *Id.* at 63–65. Additional evidence supports these claims of responsibility. Significantly, an investigation by the French government concluded that ISIS was responsible for the Paris attack. *Id.* at 65. In addition, Abdelhamid Abaaoud—who is described as the ringleader of the attack—was a known operator of ISIS's external operations division. *Id.* at 65.

Plaintiff Reynaldo Gonzalez seeks damages stemming from the death of his daughter in this attack. Compl. ¶ 10.

### C. The Nice Attack

During the Bastille Day celebration in Nice, France on July 14, 2016, Mohamed Lahouaiej-Bouhlel drove a large truck down the Promenade des Anglais, plowing into pedestrians on the crowded street. Gartenstein Report at 67. After driving nearly a mile, Lahouaiej-Bouhlel got out of the truck and began shooting at police officers before the police shot and killed him. *Id.* at 67. In all, Lahouaiej-Bouhlel killed 86 people, including Sean Copeland and his son Brodie Copeland. *Id.*; *see also* Declaration of Kimberly Copeland at ¶ 8 ("Copeland Decl.") [Dkt. # 16-8].

Two days after the attack, ISIS claimed responsibility for the Nice attack through a statement on its media outlet—the 'Amaq News Agency—and on a broadcast from its radio station, al-Bayan. Gartenstein Report at 67–68. Similar to its other attacks, ISIS praised

the attacker for heeding ISIS's call "to target states participating in the Crusader coalition that fights the Caliphate." *Id.* at 69. I agree with Dr. Gartenstein-Ross's conclusion that both statements originated from ISIS-run media outlets. *Id.* at 67–71.

Other evidence supports these claims. A French investigation found that Lahouaiej-Bouhlel consumed ISIS propaganda, including pictures of militants draped in Islamic State flags and a video of a hostage execution. *Id.* at 71. Further, there is evidence that an ISIS recruiter named Rachid Kassim helped plot the attack virtually. *Id.* at 72. The evidence includes a statement from Lahouaiej-Bouhlel's uncle that his nephew was indoctrinated by an individual fitting Kassim's description, Kassim's propaganda videos that called on ISIS supporters to conduct attacks in France similar to the Nice attack, Kassim's attempted coordination of an attack with two teenage girls from "the same area of Nice as" Lahouaiej-Bouhlel, and Kassim's involvement in other attacks throughout France. *Id.* at 72–73. Although the evidence linking Kassim to Lahouaiej-Bouhlel is circumstantial, it corroborates ISIS's claim of responsibility for the attack.

Plaintiffs Kim Copeland, the Estate of Sean Copeland, and the Estate of Brodie Copeland seek damages stemming from the deaths of Sean Copeland and Brodie Copeland in the Nice attack. Compl. ¶¶ 11–13.

### D. The Barcelona Attack

On August 17, 2017, Younes Abouyaaqoub drove a rented van down the popular Las Ramblas boulevard in Barcelona, Spain. Gartenstein Report at 73. Abouyaaqoub hopped the curb and drove more than 1,600 feet down the sidewalk, swerving to hit pedestrians. *Id.* His attack left more than a hundred injured and thirteen people dead,

including Jared Tucker. *Id.*; *see also* Declaration of Isabella Tucker at ¶ 5 ("Tucker Decl.") [Dkt. # 16-9]; Declaration of Danelle Sinclair at ¶ 9 ("Sinclair Decl.") [Dkt. # 16-10]. Four days later, police shot and killed Abouyaaqoub during a raid in a rural Spanish town. Gartenstein Report at 73.

ISIS issued a statement claiming responsibility for the attack on its 'Amaq News Agency on the day of the attack, as well as in an official communique issued two days later. *Id.* at 74. Here too, I agree with Dr. Gartenstein-Ross's conclusion that the statements were authentic claims made by ISIS-controlled media outlets. *Id.* at 74–78. In addition to these statements, ISIS released propaganda taking credit for and publicizing the attacks. *Id.* at 78–81.

Spanish authorities likewise concluded that Abouyaaqoub was an operator in an ISIS-affiliated terrorist cell—referred to as the "Ripoll cell"—that was responsible for the attack. *Id.* at 81–83. The leader of the cell, a local imam named Abdelbaki Es Satty, referred to himself and members of the cell as "soldiers of the Islamic State in the land of al-Andalus." *Id.* at 73, 81. Es Satty had connections with known ISIS fighters and recruiters. *Id.* at 83–84. Spanish investigators found that the Ripoll cell was organizing and planning additional attacks using explosives that appeared to have been constructed in accordance with ISIS manuals. *Id.* at 83. But after two members of the cell accidently blew themselves up, Abouyaaqoub changed course to the backup plan: using a vehicle to run over pedestrians. *Id.*

Plaintiffs A. Tucker, O. Tucker, and Isabella Tucker seek damages stemming from the death of Jared Tucker in this attack. Compl. ¶¶ 14–16.

### E.  Syria and ISIS

"Syria has provided safe haven and support to terrorist organizations within its borders for decades." *Sotloff v. Syrian Arab Republic*, No. 18-cv-1625, 2021 WL 965882, at *1 (D.D.C. Mar. 15, 2021) (Kelly, J.) (citing 45 Fed. Reg. 33956 (May 21, 1980)).[3] Numerous courts in this Circuit have held that Syria supported ISIS and its predecessor organizations, *see, e.g.*, *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 192–95 (D.D.C. 2017) (Kollar-Kotelly, J.); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 36–37 (D.D.C. 2016) (Howell, J.); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 67–69 (D.D.C. 2008) (Collyer, J.), and I concur with my colleagues.

Syria's relationship with ISIS is longstanding.  ISIS is the most recent iteration of the Zarqawi organization, a militant group founded by Abu Musab Al Zarqawi ("Zarqawi") in the early 1990's.  Gartenstein Report at 9–10.  After the U.S. invaded Iraq in 2003, Zarqawi pledged allegiance to Osama bin Laden, and his organization operated as al-Qaeda in Iraq ("AQI"). *Id.* at 13.

---

[3] The Court has the discretion to take judicial notice about facts "not subject to reasonable dispute" if it is "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  "This ability to take notice of adjudicative facts extends to judicial notice of court records in related proceedings." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (Lamberth, C.J.) (citing cases).  "Because of the multiplicity of FSIA-related litigation in this jurisdiction, [c]ourts in this District have thus frequently taken judicial notice of earlier, related proceedings." *Id.* (citing cases). Thus, courts in subsequent related cases may "rely upon the evidence presented in earlier litigation ... without necessitating the formality of having that evidence reproduced." *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 7 (D.D.C. 2011) (Lamberth, C.J.) (citation and quotation omitted).

Syria aided AQI's operations in Iraq. This backing ranged from "tacit approval" to "blatant support," the latter of which came in the form of actively recruiting, training, funding, and sheltering militants in Syria to fight against Iraqi security forces, the U.S., and coalition forces in Iraq. *Id.* at 20–30; *Gates*, 580 F. Supp. 2d at 59–63 (RMC); *Thuneibat*, 167 F. Supp. 3d at 29–30 (BAH). Syria's support for AQI was intended to "tie down" the U.S. in Iraq, allow the battlefield in Iraq to act as an outlet for Syria's domestic jihadists, and to gain "street cred" as one of few Arab nations opposing the U.S. presence in Iraq. Gartenstein Report at 27; *Sotloff*, 2021 WL 965882, at *2 (TJK). Syrian President Bashar al-Assad's regime had direct contacts with AQI during this time, including through Assad's "leader of the Iraqi wing of the Syrian Ba'ath party," Fawzi Mutlaq al-Rawi. Gartenstein Report at 28.

Syria maintained its support for the Zarqawi organization—operating at this time under the moniker of the Islamic State of Iraq ("ISI")—throughout the Arab Spring, despite the group "actively fighting the [Assad] regime" during the country's civil war. Gartenstein Report at 30–49. This seemingly incongruous situation arose from Assad's fear that a foreign military intervention—such as the NATO intervention that drove Muammar al-Qaddafi out of power in Libya—could threaten the regime. *Id.* at 30. Assad's support of ISI helped quell this fear by strengthening the more extreme jihadist composition of the anti-Assad forces, thus making intervention less palatable to foreign powers. *Id.* at 30.

Assad supported ISI through several major initiatives. The first began in 2011 when Assad released inmates "en masse" from Sendaya prison, a notoriously brutal jail that held

some of Syria's most battle-hardened and extreme jihadists. *Id.* at 31. Assad released hundreds of prisoners unconditionally, in effect allowing them to join up with ISI. *Id.* Among these released prisoners was Abu Luqman who quickly became known as "the most feared jihadist in Raqqa" and encouraged hundreds of fighters from Jabhat al-Nusra—another extremist group—to join ISI. *Id.* at 32–33. Multiple officials from both within Assad's regime and the U.S. Government confirmed that Assad *intended* to strengthen violent extremism within ISI by releasing hundreds of prisoners. *Id.* 30–32. These sources included then Secretary of State John Kerry who described ISIS as being created—at least in part—by Assad's calculated decision to "releas[e] 1,500 prisoners from jail." *Id.* at 32.

The second initiative was Assad's financial support for the Zarqawi organization. As early as 2005, the Zarqawi organization was financing itself, in part, through the sale of stolen oil. *Id.* at 40. In 2014, the Zarqawi organization made between $150 million and $450 million from oil sales. *Id.* at 42. During this time, the Assad regime was a major buyer of the Zarqawi organization's stolen oil, at one point purchasing up to 20,000 barrels per day. *Id.* at 42–49; *see Sotloff*, 2021 WL 965882, at *3 (TJK). What's more, the Assad regime permitted the Zarqawi organization to use Syria's financial institutions within ISIS-controlled territories, which, in turn, allowed ISIS to create a local economy and to send money abroad to buy weapons and resources. *Sotloff*, 2021 WL 965882, at *3 (TJK).

Finally, Syria supported the Zarqawi organization—operating under its current moniker, Islamic State of Iraq and al-Sham—through tacit military cooperation. Although Assad was publicly fighting against ISIS as it expanded into Syria, much of the regime's fight against ISIS was disingenuous. Indeed, Syria "cooperated militarily with ISIS by

often refraining from targeting ISIS positions and encouraging it to attack more moderate forces that opposed Assad's regime." *Id.* at *4. With Syria's continued support, ISIS made significant advances in 2014. Gartenstein Report at 18–19. It seized swathes of land from other rebel groups in Syria, including the city of Raqqa, as well as the Iraqi cities of Mosul, Tikrit, and Fallujah. *Id.* at 19.

Following its battlefield successes, ISIS expanded its reach and influence across the globe. *Id.* Dr. Gartenstein-Ross attributes this rapid expansion, in part, to the organization's "powerful propaganda machine." *Id.* Leveraging its global notoriety, ISIS managed to establish local branches—or persuade existing groups to pledge allegiance to the organization—in other countries, including Afghanistan, Algeria, Bangladesh, Egypt, Libya, Nigeria, the Philippines, Somalia, and Yemen. *Id.* at 19. The group also distributed "instruction manuals advocating for the use of [explosives]" in terrorist attacks. *Id.* at 83. ISIS encouraged its followers to swear allegiance to the organization before committing brutal terrorist attacks against civilians. *See id.* at 49–51. Adhering to these instructions, extremists across the world left "digital, written, or other physical evidence during their attacks to link themselves to ISIS." *Id.* at 49.

## PROCEDURAL HISTORY

Plaintiffs filed their complaint in this case on June 18, 2018. *See* Compl. [Dkt. # 1]. Their complaint seeks compensatory, solatium, and punitive damages, prejudgment interest, and attorneys' fees and costs arising out of the four terrorist attacks: (1) the November 9, 2015 shooting at the International Police Training Center in Amman, Jordan ("Jordan attack"); (2) the November 13, 2015 shooting at La Belle Equipe Café in Paris,

France ("Paris attack"); (3) the July 14, 2016 cargo truck attack in Nice, France ("Nice attack"); and (4) the August 17, 2017 van attack on Las Ramblas in Barcelona, Spain ("Barcelona attack"). *Id.* ¶¶ 22–64.

Syria was served with the summons and complaint on January 20, 2019.  Return of Service/Affidavit [Dkt. # 12].  On March 22, 2019, after Syria failed to answer or otherwise respond to the complaint, plaintiffs moved for the Clerk to enter a default against Syria. Affidavit for Default [Dkt. # 14].  The Clerk entered a default against Syria on March 27, 2019.  Clerk's Entry of Default [Dkt. # 15].

In March of 2020, plaintiffs moved for default judgment against Syria.  *See* Pls.' Mot.  Plaintiffs included declarations from each plaintiff—or their representative—as well as expert witness reports by Dr. Daveed Gartenstein-Ross, Colin Weir, and Henri Daudet. *See* Exs. 2–10 of Pls.' Mot. [Dkt. ## 16-2–16-10].  Syria has not entered an appearance in this case, let alone filed a response to plaintiffs' complaint or motion for default judgment. Consequently, plaintiffs' motion is now ripe for review.

## STANDARD OF REVIEW

A default judgment may be entered "when the adversary process has been halted because of an essentially unresponsive party." *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)).

For default judgment under the Foreign Sovereign Immunities Act ("FSIA"), plaintiffs must "establish[ ] [their] ... right to relief by evidence satisfactory to the court" before the judgment is entered.  28 U.S.C. § 1608(e).  This requirement "imposes a duty

on [the] court[ ] to not simply accept a complaint's unsupported allegations as true, and obligates courts to inquire further before entering judgment against parties in default." *Firebird Glob. Master Fund II Ltd. v. Republic of Nauru*, 915 F. Supp. 2d 124, 126 (D.D.C. 2013) (Roberts, J.) (citation and quotation omitted). "[T]he FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be satisfactory to the court." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014) (citation and quotation omitted). Default judgment is appropriate "when the plaintiff shows her claim has some factual basis, … even if she might not have prevailed in a contested proceeding." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (citation and quotation omitted), *vacated & remanded on other grounds sub nom. by Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).

Where a plaintiff invokes the FSIA's terrorism exception, as plaintiffs do here, "courts must be mindful that Congress enacted [that] exception ... with the 'aim[ ] to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability[.]'" *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 74 (D.D.C. 2017) (Howell, C.J.) (quoting *Han Kim*, 774 F.3d at 1047–48). "[I]ndeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Owens*, 864 F.3d at 785 (citation and quotation omitted) ("[Courts have] an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism.").

A court's discretion extends to the admission of expert testimony, which is often "of crucial importance in terrorism cases ... because firsthand evidence of terrorist activities is difficult, if not impossible, to obtain," "[v]ictims of terrorist attacks ... are often ... unable to testify about their experiences," and "[p]erpetrators of terrorism typically lie beyond the reach of the courts and go to great lengths to avoid detection." *Id.* at 787 (citation omitted). Further, "[e]yewitnesses in a state that sponsors terrorism are similarly difficult to locate," and "[t]he sovereigns themselves often fail to appear and to participate in discovery[.]" *Id.* Consequently, "reliance upon secondary materials and the opinions of experts is often critical in order to establish the factual basis of a claim under the FSIA terrorism exception." *Id.*

## CONCLUSIONS OF LAW

Plaintiffs are entitled to a default judgment against Syria if "(1) the Court has subject matter jurisdiction over the[ir] claims, (2) personal jurisdiction is properly exercised over [Syria], (3) [plaintiffs] have presented satisfactory evidence to establish their claims[,] ... and (4) [they] have satisfactorily proven that they are entitled to the monetary damages they seek." *Braun*, 228 F. Supp. 3d at 75 (BAH). The first three of these requirements are easily satisfied here. And as explained below, plaintiffs have proven their entitlement to some, but not all, of the damages they seek. Accordingly, default judgment will be entered in their favor.

## I.   Subject Matter Jurisdiction

The FSIA is the sole avenue for an individual to sue a foreign sovereign in the courts of the United States. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428,

443 (1989).  Foreign states are presumptively immune from the jurisdiction of the federal courts, subject to several exceptions.  28 U.S.C § 1604.  Relevant here, the "terrorism exception" provides that state sponsors or terrorism are not immune from federal jurisdiction in suits for "personal injury or death" in some circumstances.  *Id.* § 1605A(a)(1).

The terrorism exception applies when money damages are sought (1) from a "foreign state [that] was designated as a state sponsor of terrorism at the time [of] the act" giving rise to the suit, (2) where either "the claimant or the victim was" "a national of the United States," (3) after "the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim" if "the act occurred in the foreign state against which the claim has been brought," (4) to compensate the claimant for "for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act," by foreign officials acting in their official capacity.  *Id.* § 1605A(a).  Plaintiffs meet the requirement for subject matter jurisdiction here.

First, as designated by the U.S. State Department, Syria has been a state sponsor of terrorism since December 29, 1979.  *See* Revision of Foreign Policy Controls on Exports to Syria, Iraq, Libya, and the People's Democratic Republic of Yemen, 45 Fed. Reg. 33,956 (May 21, 1980); *see also Sotloff*, 2021 WL 965882, at *8 (TJK).

Second, at all relevant times, each claimant (except Gonzalez) and each victim was a citizen of the United States.  Fields Decl. at ¶¶ 3–4; Creach Decl. at ¶¶ 3–4; Gonzalez Decl. at ¶¶ 3–4; Copeland Decl. at ¶¶ 3–4; Tucker Decl. at ¶ 3; Sinclair Decl. at ¶¶ 4–5, 8.

U.S. citizens are nationals under the FSIA.   28 U.S.C. § 1605A(h)(5) (incorporating definition from 8 U.S.C. § 1101(a)(22)).   Accordingly, "the claimant or the victim was ... a national of the United States" for each plaintiff's suit.  *Id.* § 1605A(a)(2)(ii)(I).

The <u>third</u> requirement applies only where damages are sought for an "act [that] occurred in the foreign state against which the claim has been brought[.]"   *Id.* § 1605A(a)(2)(A)(iii).   Because plaintiffs' claims seek damages for attacks that took place outside of Syria, the third requirement does not apply here.

Finally, <u>fourth,</u> plaintiffs must establish that their damages resulted from at least one of the enumerated terrorist acts in the statute—such as an "extrajudicial killing"—that was "caused by" Syria's "provision of material support or resources" to ISIS.   *Id.* § 1605A(a)(1). Plaintiffs have satisfied this requirement because (1) each victim's death was the result of an extrajudicial killing, and (2) Syria provided material support to ISIS that proximately caused the extrajudicial killings.

The deaths of the victims in this case qualify as extrajudicial killings.  The FSIA defines "extrajudicial killing" by reference to the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1605A(h)(7), which, in turn, defines "extrajudicial killing" as:

> [A] deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1992), *codified at* 28 U.S.C. § 1350 note.   Thus, to establish an extrajudicial killing under FSIA,

plaintiffs must have suffered: "(1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens*, 864 F.3d at 770.

As detailed in plaintiffs' declarations and described above, I find that the deaths of Lloyd Fields, Jr., James Creach, Nohemi Gonzalez, Sean Copeland, Brodie Copeland, and Jared Tucker were the result of killings that were deliberated.  In each attack, the culprit either intentionally shot at the victims or swerved their vehicle into victims on busy streets or sidewalks, and the amount of preparation, planning, and coordination to carry out the attacks establishes that they were deliberated.  *Owens*, 864 F.3d at 770 (citation and quotation omitted) (defining "deliberated" under the TVPA as "being undertaken with studied consideration and purpose").  In addition, these attacks were *not* authorized by a regularly constituted court.   Consequently, the deaths of the victims qualify as "extrajudicial killings" under the FSIA.

I find that ISIS committed these extrajudicial killings.  I note first that ISIS's involvement in the Paris attack, Nice attack, and Barcelona attack is well established.  ISIS claimed responsibility for each of the attacks, and investigations by French and Spanish authorities concluded that ISIS was indeed behind them.  Gartenstein Report at 60–66, 67– 73, 74–84.  The evidence—and particularly the findings from law enforcement—shows that known ISIS operatives were directly involved in planning, coordinating, and executing the Paris, Nice, and Barcelona attacks.  *See id.*

While the connection between ISIS and the Amman attack is more attenuated, I find that ISIS carried out this attack as well.  For one, the attacker expressed jihadist views to

his friends before the attack, and Jordanian security officials cited evidence of "radical Islamist influences on [the perpetrator]." *Id.* at 58. The attacker's conduct during the incident—namely, shouting *Allahu Akbar* before opening fire—is also consistent with other ISIS attacks. *Id.* at 58–59. In addition, ISIS claimed responsibility for the attack, and I am persuaded by Dr. Gartenstein-Ross's opinion that this claim is credible.[4] *Id.* at 55–58. To be sure, Jordanian officials characterized the attacker as a lone wolf, but I am persuaded by Dr. Gartenstein's conclusion that these officials had political and economic incentives for downplaying the attacker's links to ISIS. *See id.* at 59–60. I find that, with this evidence, plaintiffs have established a sufficient connection between ISIS and the Amman attack for me to conclude that ISIS is responsible for the attack.

I next find that Syria provided "material support" to ISIS. The FSIA defines "material support" as:

> [A]ny property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

28 U.S.C. § 1605A(h)(3) (incorporating definition from 18 U.S.C. § 2339A(b)(1)).

As described above, plaintiffs have established that Syria provided material support to ISIS by providing a safe haven for recruiting and training militants, allowing safe

---

[4] Dr. Gartenstein-Ross explained that ISIS began to make false claims of responsibility in 2017 as its territory was declining. Gartenstein Report at 49. But when the Amman attack took place in 2014, ISIS's claims were "generally credible" and—as is the case here—corroborated by "digital and physical evidence[.]" *Id.*

passage of jihadists from Syria into Iraq, purchasing stolen oil from ISIS, permitting ISIS to use Syria's financial network, and coordinating militarily with ISIS.  Gartenstein Report at 20–49; *Sotloff*, 2021 WL 965882, at \*1–\*4 (TJK).  Syria's support satisfies the FSIA's definition of "material support" because it includes "property" and "service[s]," such as "monetary instruments," "financial services," "lodging," "training," "safehouses," and "personnel."  18 U.S.C. § 2339A(b)(1).  Moreover, I take judicial notice and agree with the conclusions of several courts in our Circuit that have found that Syria provided material support to the Zarqawi organization.  *See Sotloff*, 2021 WL 965882, at \*12 (TJK); *Foley*, 249 F. Supp. 3d at 192–95 (CKK); *Thuneibat*, 167 F. Supp. 3d at 36–37 (BAH); *Gates*, 580 F. Supp. 2d at 67–68 (RMC).

Finally, I find that Syria's material support of ISIS caused the extrajudicial killings of the victims.  Here, plaintiffs need not prove that Syria "specifically knew of or intended its support to cause" the particular attacks in question, *Owens*, 864 F.3d at 798, or that Syria's material support was the "but for" cause of the injuries, *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004).  Instead, plaintiffs need establish only proximate cause.  *Kilburn*, 376 F.3d at 1128.  And plaintiffs can meet the proximate cause standard by showing: (1) that Syria's material support of ISIS was a "substantial factor in the sequence of events" that led to the victims' extrajudicial killing, and (2) that what happened to them was "reasonably foreseeable or anticipated as a nature consequence" of Syria's support.  *Owens*, 864 F.3d at 794 (citation and quotation omitted).  Plaintiffs have met this standard.

First, the Court finds that Syria's material support of ISIS was a "substantial factor in the sequence of events" that led to the death of the victims here. As described above, Syria has long provided the Zarqawi organization with personnel, training, financial resources, and a safe haven from which it could operate. *See supra*. These efforts permitted the organization to establish a "seedbed for ... violent extremist elements[.]" Gartenstein Report at 38–39; *see also Sotloff*, 2021 WL 965882, at *12–*13 (TJK). They also helped ISIS become "a wealthy proto-state with sophisticated, battle-hardened leadership that controlled large swaths of territory." *Sotloff*, 2021 WL 965882, at *12 (TJK). And it was precisely this success that allowed "ISIS's reach and influence" to "quickly extend[] far beyond Iraq and Syria," culminating in a global following of terrorist cells that committed atrocities such as the attacks in this case. Gartenstein Report at 19. Syria's role was thus a substantial factor in the sequence of events that led to these attacks.

Second, plaintiffs have shown that the victims' extrajudicial killings were a reasonably foreseeable consequence of Syria's material support of ISIS. The Zarqawi organization was long known as a violent extremist group that supported brutal terrorist tactics. *Id.* at 10–19. And ISIS had a history of directing and inspiring its followers to conduct attacks, sometimes with the help of a virtual plotter. *Id.* at 49–52. In fact, Syria *intended* for the Zarqawi organization to "create violence and terrorism" for nearly a decade before the first of the attacks at issue here. *Id.* at 31–32. It is not surprising—and indeed it is reasonably foreseeable—that ISIS would continue to conduct such attacks elsewhere, especially as its ambition to establish a worldwide caliphate grew in 2013 and 2014. *See id.* at 19; *accord Thuneibat*, 167 F. Supp. 3d at 37 (BAH) (collecting cases

finding proximate causation where defendants funded known terrorist groups that injured plaintiffs).

Consequently, plaintiffs have established that this Court has subject matter jurisdiction over each of their claims.

## II.     Personal Jurisdiction Over Syria

I turn next to whether the Court has personal jurisdiction over Syria. *See* 28 U.S.C. § 1330(b). I find that it does.

The FSIA lists four methods for plaintiffs to serve Syria in the order in which plaintiffs must attempt them. 28 U.S.C. § 1608(a). The first two methods do not apply to Syria because it does not have a special arrangement with plaintiffs and is not party to an international convention on service. *See* 28 U.S.C. §§ 1608(a)(1), (2); *see also Sotloff*, 2021 WL 965882, at *14 (TJK). Plaintiffs attempted to serve Syria by the means outlined in subsection (a)(3), *see* Request for Foreign Mailing [Dkt. ## 5, 6], but the summons was returned unexecuted, *see* Summons Returned Unexecuted [Dkt. # 9]. Plaintiffs were successful, however, serving Syria by the means outlined in subsection (a)(4). *See* Request for Foreign Mailing [Dkt. ## 8, 10]; Certificate of Clerk [Dkt. # 11]. The summons, complaint, and notice of suit were delivered to the Syrian Ministry of Foreign Affairs under cover of diplomatic note on January 20, 2019. Return of Service/Affidavit [Dkt. # 12].

I thus find that the Court has personal jurisdiction over Syria because plaintiffs properly served Syria under 28 U.S.C. § 1608(a) and because the Court has subject matter jurisdiction over plaintiffs' claims. *See* 28 U.S.C. § 1330(b).

### III.   Syria's Liability

Plaintiffs that are United States nationals may use the FSIA's cause of action. *See* 28 U.S.C. § 1605A(c). Plaintiffs that are foreign nationals—for which the federal cause of action is unavailable—may state a claim under state or foreign law. *See Owens*, 864 F.3d at 807–09.

### A. Federal Law Claims

Once a court has established subject matter jurisdiction, "little else is needed to show that [p]laintiffs are entitled to relief" under the FSIA's private right of action. *Sotloff*, 2021 WL 965882, at *14 (TJK) (citing 28 U.S.C. § 1605A(c)). Indeed, "a plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law" if the plaintiff is a U.S. national, a member of the armed forces, an employee of the U.S. government, or a legal representative thereof. *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 86–87 (D.D.C. 2018) (Moss, J.); *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 495–96 (D.D.C. 2021) (Mehta, J.). Consequently, because the Court "has subject matter jurisdiction over [p]laintiffs' claims under the terrorism exception," all plaintiffs who are nationals of the United States have established "that [Syria] is liable for [p]laintiffs' injuries under 28 U.S.C. § 1605A(c)." *Lee*, 518 F. Supp. at 496 (APM).

Plaintiff Gonzalez, however, is not a national of the United States and is not bringing his claims as the legal representative of his daughter. *See* Gonzalez Decl. ¶¶ 2–3; Compl. ¶ 10. Consequently, Gonzalez's federal law claim under § 1605A fails as a matter of law. *See Fritz*, 320 F. Supp. 3d at 87 (RDM). Nevertheless, Gonzalez may still recover damages

if he establishes liability under a state or foreign source of substantive law.  *See Owens*, 864 F.3d at 809 (explaining that FSIA's "pass-through approach" remains a "viable" option for individuals who are unable to assert the federal cause of action, such as "foreign family members").

## B.  State and Foreign Law Claims

Gonzalez asserts claims for intentional inflection of emotional distress and loss of solatium arising under either United States common law or French law.  *See* Compl. ¶¶ 104–111; Pls.' Mot. at 10–13.[5]   In determining the appropriate law to apply to Gonzalez's claims, I must apply the choice of law rules of the forum state.  *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 841–42 (D.C. Cir. 2009).   Under District of Columbia law, "[r]esolution of" a choice of law issue "depends on whether the jurisdictions' laws present no conflict, a false conflict, or a true conflict."  *Barimany v. Urb. Pace LLC*, 73 A.3d 964, 967 (D.C. 2013).   "A no conflict situation arises when the laws of the different jurisdictions are identical or would produce the identical result on the facts presented."  *Id.* (citation and quotation omitted).   "A false conflict situation arises when the policy of one jurisdiction would be advanced by application of its law, and the policy of the other jurisdiction would not be advanced by application of its law."  *Id.* (citation and quotation omitted).   "A true conflict arises when both states have an interest in applying their own laws to the facts of the case."  *Id.* (citation and quotation omitted).

---

[5] For all plaintiffs except for Gonzalez, state and foreign law claims are "redundant of their federal law claims and do not provide any additional right to recover."  *Fritz*, 320 F. Supp. 3d at 89 (RDM); *see also Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 44 n.35 (D.D.C. 2020) (Contreras, J.).

There are three potential choices of law for resolving Gonzalez's claims: the law of the forum (the District of Columbia), the law of the place of the tort (France), and the law of Gonzalez's domicile (Washington[6]).  *See Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 154 (D.D.C. 2011) (Bates, J.).  There is no conflict among these jurisdictions, as each would recognize Gonzalez's claim for compensatory damages and thus "would produce [an] identical result[.]"  *Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 714 (D.C. 2013); *accord Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 48 (D.D.C. 2020) (Contreras, J.) (no conflict where Lebanese law and District of Columbia law would both recognize plaintiff's claims for emotional distress); *Est. of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 21 (D.D.C. 2011) (Bates, J.) (same); *Owens*, 826 F. Supp. 2d at 155 (JDB) (finding "no clear conflict of law" where all relevant jurisdictions "allow[ed] immediate family members to recover for their emotional distress").

To begin, District of Columbia law would permit Gonzalez to bring an intentional infliction of emotional distress ("IIED") claim.  The District of Columbia—adopting the Restatement (Second) of Torts elements of IIED—requires plaintiffs to prove that a defendant (1) engaged in "extreme and outrageous conduct" (2) that "intentionally or recklessly" (3) "cause[d] severe emotional distress[.]"  *Republic of Sudan v. Owens*, 194 A.3d 38, 41 (D.C. 2018) (quoting Restatement (Second) of Torts, § 46 (Am. L. Inst. 1965)).  While a plaintiff is generally required to have been present at the time of the injury in order

---

[6] Plaintiffs' Motion for Default Judgment asserts that Gonzalez is "a resident of California[.]"  Pls.' Mot. at 10.  However, plaintiffs' Complaint and Gonzalez's own declaration—submitted with the Motion for Default Judgment—state that Gonzalez is a resident of Washington.  *See* Compl. ¶ 10; Gonzalez Decl. at ¶ 3.

to recover on an IIED claim, the D.C. Court of Appeals has explained that this "presence requirement" does not apply in FSIA cases where "the plaintiff's severe distress arises from a terrorist attack that killed or injured a member of his or her immediate family." *Id.* at 45. Consequently, courts in this Circuit allow FSIA plaintiffs to recover for IIED under District of Columbia law, even when they were not present at the time of the injury. *See, e.g.*, *Maalouf v. Islamic Republic of Iran*, 514 F. Supp. 3d 280, 287–88 (D.D.C. 2021) (Bates, J.); *Fritz v. Islamic Republic of Iran*, 466 F. Supp. 3d 13, 17–20 (D.D.C. 2020) (Moss, J.).

Washington law would also permit Gonzalez to bring an IIED claim under these circumstances.  Like the District of Columbia, Washington has adopted the IIED elements from the Restatement (Second) of Torts.  *Kloepfel v. Bokor*, 149 Wash. 2d 192, 195–96 (2003) (en banc).  Unlike the District of Columbia, Washington's highest court has not had occasion to pass on whether it would waive the presence requirement in a suit stemming from a terrorist attack.  However, as District of Columbia law demonstrates, courts applying the Restatement (Second) have generally found that the Restatement's exception to the presence requirement for "conduct ... directed at a third person," *see* Restatement (Second) of Torts, § 46, comment l (Am. L. Inst. 1965), applies in FSIA cases because "a terrorist attack-by its nature-is directed not only at the victims but also at the victims' families." *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 43–44 (D.D.C. 2007) (Lamberth, J.) (citation and quotation omitted) (collecting cases).  I thus conclude— consistent with other courts in our Circuit—that Washington law would except the presence requirement and allow Gonzalez to proceed with his IIED claim.  *See Dammarell v. Islamic Republic of Iran*, 2006 WL 2382704, at *176 (D.D.C. Aug. 17, 2006) (Facciola,

J.) (concluding that "Washington's possible presence requirement is inapplicable" in IIED claim by "surviving family members of victims of terrorist activities"); *Peterson*, 515 F. Supp. at 44 (RCL) (same).

Gonzalez would satisfy the Restatement (Second) elements of IIED incorporated under District of Columbia and Washington law.  First, Syria intentionally provided material support to ISIS which foreseeably resulted acts of terrorism.  Second, the terrorist attack at issue here—a mass shooting intended to instill fear and suffering, Gartenstein Report at 60—plainly qualifies as extreme and outrageous context.  *See Maalouf*, 514 F. Supp. at 288 (JDB) (citation omitted); *see also Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 246 (D.D.C. 2020) (Bates, J.) (explaining that "acts of terrorism by their very definition amount to extreme and outrageous conduct") (citation and quotation omitted) (alterations omitted).  Third, Gonzalez has suffered severe emotional distress from the loss of his daughter.  *See* Gonzalez Decl. ¶ 7.  Accordingly, Gonzalez would be able to recover under either District of Columbia or Washington law.

Finally, French law would recognize Gonzalez's claim for "moral" damages. Plaintiffs submitted an expert report by Henri Daudet, a French attorney, who has been practicing law since 2012.  Decl. of Henri Daudet ("Daudet Decl.") [Dkt. # 16-4] at 1. Based on Daudet's experience and the reasonable analysis in his expert report, I find that he is qualified as an expert on French law.  *See* Fed. R. Civ. P. 44.1 (explaining that courts may consider "any relevant material or source, including testimony," "[i]n determining foreign law").  Under French law, a parent may recover for "moral damages," which are "affection damages in [the] event of the death of a close relative."  Daudet Decl. at 5.  To

establish a claim for moral damages, a plaintiff must prove (1) "a wrongful, negligent, or reckless act," (2) that caused, (3) damages. *Id.* at 2. And a "ricochet victim"—one who suffers damages indirectly from the death of another—is almost automatically entitled to moral damages when the ricochet victim and the deceased victim are immediate family members, such as a parent and child. *Id.* at 3, 5. As explained above, Syria's material support of a terrorist organization proximately caused the attack in which Nohemi Gonzalez was killed, resulting in severe emotional distress for plaintiff Gonzalez. I thus concur with Daudet's declaration and find that "a French Court would recognize Mr. Gonzalez's ... right to claim for moral damages." *Id.* at 6.

Where, as here, "no conflict of laws exists" between the relevant forums, "[i]t is unnecessary to engage in a conflict of laws analysis." *Young Women's Christian Ass'n of the Nat'l Cap. Area, Inc. v. Allstate Ins. Co. of Canada*, 275 F.3d 1145, 1150 (D.C. Cir. 2002). Because each jurisdiction would recognize Gonzalez's claim against Syria, I find Syria liable without resort to a conflict of laws analysis.

## IV.   Damages

I turn now to the appropriate damages for plaintiffs' losses. Plaintiffs seek recovery for economic damages, solatium, and punitive damages. Compl. ¶¶ 98–116. For the plaintiffs utilizing the federal cause of action, section 1605A(c) provides that money damages include "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). "To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were 'reasonably certain' (i.e., more likely than not) to occur, and must prove the amount

of damages by a 'reasonable estimate' consistent with this [Circuit]'s application of the American rule on damages.'" *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015) (Lamberth, J.) (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (Bates, J.)) (alterations in original).  To determine the "reasonable estimate" of damages, "courts may look to expert testimony and prior awards for comparable injury." *Braun*, 228 F. Supp. 3d at 82 (BAH).

Here, the plaintiffs have satisfactorily shown their injuries "were reasonably certain" to occur.  As already discussed at length, Syria provided material support to a known terrorist organization with a history of launching brutal attacks on civilians. Gartenstein Report at 49–51.  Notably, some of the support that Syria provided to ISIS— such as Assad's release of hundreds of prisoners—was *intended* to "strengthen violent extremists." *Id.* at 31–32.  As such, Syria's material support of ISIS was reasonably certain to result in the deaths of the victims in the four attacks and to injure the victims' families.

**A. Economic Damages**

Plaintiffs provide a declaration of Colin B. Weir, Vice President at Economics and Technology, Inc, in support of their claim for economic damages.  *See* Decl. of Colin B. Weir ("Weir Decl.") [Dkt. # 16-3].[7]  Weir calculated economic damages—including lost wages and benefits and "lost value of life"—for the estates of four of the victims here:

---

[7] Weir holds a Masters of Business Administration, with honors, from Northeastern University and has submitted testimony and expert reports and been deposed in dozens of cases in both state and federal courts.  Weir Decl. at ¶ 1.  I find that Weir relied on a reasonable methodology and reasonable assumptions to calculate the lost wages and benefits.  As such, I find that Weir is qualified as an expert in lost wages and benefits.

James Damon Creach, Lloyd Fields, Jr., Sean Copeland, and Brodie Copeland. *Id.* ¶ 45 Weir utilized a gross earnings model that incorporated information about the decedents' "age, occupation, and wages at the time of death," along with publicly available "life expectancy tables, past wage growth, inflation statistics," and "interest rates." *Id.* ¶ 9.

Weir relies on reasonable assumptions and data for his conclusions as to the victims' lost earnings.  Consequently, I find that the following damages are appropriate for the victims' economic losses: $8,263,322.39 for the Estate of James Damon Creach, $5,206,968.25 for the Estate of Lloyd Carl Fields, Jr., $11,988,811.55 for the Estate of Sean Copeland, and $3,247,427.09 for the Estate of Brodie Copeland. *Id.* ¶¶ 21, 25, 29, 33.

Plaintiffs also request economic damages for the "Estate[ ] of ... Nohemi Gonzalez[.]" *See* Pls.' Mot. at 25.  However, Nohemi Gonzalez's estate is not a party in this matter, and Weir did not calculate economic damages for Ms. Gonzalez.  I thus find that this request for damages is not accompanied by "evidence satisfactory to the court" to establish plaintiffs' "claim or right to relief," 28 U.S.C. § 1608(e), and decline to award such damages.

The Court also declines to award plaintiffs for their "lost value of life" claim.[8]  Weir Decl. ¶¶ 36–48; Pls.' Mot. at 15–16.  Typically, economic damages include "lost wages, benefits and retirement pay, and other out-of-pocket expenses." *Owens v. Republic of*

---

[8] The "lost value of life," according to Weir, is an economic estimate of the cost of a life based on what consumers are willing to pay for safety-enhancing products or the risk workers are willing to accept for additional compensation.  Weir Decl. ¶¶ 36–48.

*Sudan*, 71 F. Supp. 3d 252, 258 (D.D.C. 2014) (Bates, J.). The victims' lost value of life, according to plaintiffs, is a category of economic damages *in addition to* lost wages, benefits, and retirement pay. But plaintiffs do not cite to any case that has awarded damages for the "lost value of life." Nor have they provided an argument for why lost value of life otherwise falls within the damages permitted by § 1605A. Consequently, I deny plaintiffs' claim for damages based on the lost value of life.

### B. Noneconomic Damages

A claim for solatium seeks compensation for "the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent, society and comfort." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009) (Friedman, J.) (citation omitted). While solatium damages are, by their nature, "unquantifiable," *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72 (D.D.C. 2015) (Huvelle, J.), courts in our Circuit often apply a standardized framework known as the *Heiser* damages framework, *see Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006) (Lamberth, J.).[9]

Under the *Heiser* damages framework, "courts typically award between $8 million and $12 million for pain and suffering resulting from the death of a spouse, approximately $5 million to a parent whose child was killed, and approximately $2.5 million to a plaintiff

---

[9] The *Hesier* damages framework is "a reasonable effort to chart solatium award baselines" but is "*not* controlling precedent." *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 361–62 (D.C. Cir. 2018) (emphasis added).

whose sibling was killed." *Heiser*, 466 F. Supp. 2d at 269. Further, awards of $3 million to children of deceased victims are typical. *Anderson v. Islamic Republic of Iran*, 839 F. Supp. 2d 263, 266 (D.D.C. 2012) (Lamberth, C.J.).

### 1. Tamara Fields

Tamara Fields's declaration describes mental anguish, anxiety, and grief following the death of her husband Lloyd Carl Fields, Jr. in the Jordan attack. Fields Decl. ¶¶ 8–9. She suffers from anxiety, depression, and difficulty sleeping and was prescribed medication for all three issues, which she continues to take. *Id.* ¶ 9. Indeed, Fields states that she had to change employment because she could not return to the office where she found out her husband had died without crying. *Id.* Considering Fields's trauma, a baseline award of $10.million is appropriate.

### 2. Creach Plaintiffs

Heather Creach, along with her two young boys, continue to suffer "severe mental anguish, extreme emotional pain and suffering, and the loss of [James Damon Creach]'s society, companionship, comfort, advice and counsel." Creach Decl. ¶ 10. Indeed, Creach was tasked with telling her two children that their father had been killed in Jordan less than a month before he was scheduled to return home. *Id.* ¶¶ 8–9. I find that a baseline solatium damages award of $10 million is appropriate for Ms. Creach and that each of her sons should receive a baseline solatium damages award of $3 million.

### 3. Reynaldo Gonzalez

For plaintiffs such as Gonzalez that bring state or foreign causes of action under the FSIA's pass-through approach, damages are awarded pursuant to the substantive source of

law under which liability was found. *See Thuneibat*, 167 F. Supp. 3d at 47 (BAH) ("Normally, damages [are] calculated pursuant to the law under which liability was found[.]"); *Est. of Doe v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 191 (D.D.C. 2013) (Bates, J.) (explaining that "D.C. law, which supplies the cause of action, dictates" the availability of damages). Having found that Syria is liable under any forum that may apply to Gonzalez's claims, I must now determine whether the application of District of Columbia, Washington, or French law governing damages would create a conflict. *See Barimany*, 73 A.3d at 967 (explaining that "choice of law analyses are properly ... considered issue by issue"). I conclude that there is no conflict.

The governing law of the District of Columbia, Washington, and France each allow for the imposition of damages consistent with the *Heiser* range, the application of which I find appropriate in this case. Indeed, courts in this Circuit applying the substantive law of these forums have awarded FSIA plaintiffs damages in accordance with the *Heiser* framework. *See Barry*, 437 F. Supp. 3d at 51–55 (RC) (applying *Heiser* range to District of Columbia IIED claims); *Peterson*, 515 F. Supp. 2d at 51 (RCL) (applying *Heiser* range to District of Columbia and Washington IIED claims); *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 24–27 (D.D.C. 2011) (Lamberth, C.J.) (applying *Heiser* range to French solatium claim); *accord* Daudet Decl. at 6 (noting that "reference scales" for moral damages resulting from the loss of a child "can be adjusted ... according to the circumstances of the case"). Because there is no conflict, I apply the *Hesier* framework to Gonzalez's claims without resort to a conflict of law analysis.

Gonzalez's daughter was tragically killed in one of a series of coordinated terrorist attacks carried out across Paris.  Gartenstein Report at 60.  As a result, Gonzalez has suffered severe emotional and mental anguish from the loss of his daughter and has missed "the enjoyment of watching [her] grow into a professional woman and follow her dreams and share in her life celebrations."  Gonzalez Decl. ¶ 7.  I find that the baseline pain and suffering damages award of $5 million is appropriate for Gonzalez's loss of his daughter in the Paris attack.

### 4.  Kimberly Copeland

Kimberly Copeland continues to suffer mental anguish and grief after watching an ISIS operative hit her husband Sean and only child Brodie with a 19-ton truck.  Copeland Decl. at ¶¶ 8–9.  Ms. Copeland survived only because Sean "heroically warned [them]." *Id.*  As a result of witnessing her husband and son's deaths, Copeland has been diagnosed with post-traumatic stress disorder, depression, and anxiety and undergoes therapy to try to overcome that event. *Id.* at ¶ 9.  I find that solatium damages at the higher end of the *Heiser* range are appropriate here because Copeland witnessed the death of her husband and son.  Consequently, I find that solatium damages in the amount of $12 million for the death of her spouse and $5 million for the death of her child are appropriate for Copeland.

### 5.  Tucker Plaintiffs

Finally, Isabella Tucker and her two minor siblings experienced and continue to experience severe mental anguish and unbearable grief from the loss of their father in the Barcelona attack.  The two minors suffer from "extreme emotional pain and suffering," "sleep disturbances, anxiety, [and] depression[.]"  Sinclair Decl. at ¶ 10.  Isabella Tucker

also describes feeling "overwhelming grief" and a negative impact on her "ability to feel safe and trust others." Tucker Decl. at ¶ 5.   I find that solatium damages in the amount of $3 million are appropriate for Isabella Tucker and for the minors identified as "(A)" and "(O)" for the loss of their father, Jared Tucker, in the Barcelona attack.

### C.  Upward Departures

The *Heiser* damages serve as baselines from which a court may deviate.  Indeed, a court may, as plaintiffs seek here, deviate upwards where the "circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." *Oveissi*, 768 F. Supp. 2d at 26–27 (RCL).  Courts award an upward departure from baseline solatium damages in cases with "aggravating circumstances, … indicated by such things as testimony which describes a general feeling of permanent loss or change caused by decedent's absence or medical treatment for depression and related affective disorders." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85–86 (D.D.C. 2010) (Lamberth, C.J.) (citation and quotations omitted) (alterations omitted).

Plaintiffs have established that an upward departure is appropriate here.  In each case, the attackers sought to terrorize and inflict maximum damage on both the victims and their family members.  Each of the family members here expresses a permanent loss of companionship and counsel from the victims of these attacks.  As courts have found in similar cases, *see Thuneibat*, 167 F. Supp. 3d at 51–52 (BAH) (collecting cases that granted a 25% upward departure), I find that an upward departure of 25% is appropriate for each of the victims' solatium damages described above.

### D. Punitive Damages

Punitive damages are permitted under 28 U.S.C. § 1605A(c) and are awarded not as compensation for the victims, but as a deterrent to "punish outrageous behavior and deter such outrageous conduct in the future." *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 290 (D.D.C. 2015) (Roberts, C.J.) (citation and quotation omitted). Punitive damages are also appropriate where "defendants supported, protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized a known terrorist organization whose modus operandi included the targeting, brutalization and murder of American citizens and others." *Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 148 (D.D.C. 2018) (Kollar-Kotelly, J.) (citation and quotation omitted).

Punitive damages are appropriate for the plaintiffs utilizing the federal cause of action in this case. As other courts in our Circuit have concluded, Syria's material support of the Zarqawi organization, "known terrorists whose stated mission is to devastate those who support Americans, certainly justifies the imposition of punitive damages[.]" *Thuneibat*, 167 F. Supp. 3d at 53 (BAH); *see also Gates*, 580 F. Supp. 2d at 74 (RMC). I will thus enter an award of punitive damages for the plaintiffs suing under the FSIA's cause of action.

However, I decline to award Gonzalez punitive damages. As I explained above, Gonzalez must establish his claim to damages under the substantive law through which he established liability. Thus, unlike the plaintiffs utilizing the FSIA's cause of action,

Gonzalez may not receive punitive damages under section 1605A(c).[10]  But plaintiffs have

neither indicated which forum's punitive damages law should apply nor directed the Court

to any source of law in those jurisdictions that would authorize the imposition of punitive

damages for Gonzalez.  Accordingly, I decline to enter such an award for Gonzalez.

For the remaining plaintiffs, courts in our Circuit have applied a variety of methods

for calculating punitive damages, including: (1) multiplying "the foreign state's annual

expenditures on terrorism by a factor between three and five;" (2) setting an award based

on "the ratio of punitive to compensatory damages set forth in earlier cases, if similar

conduct has been previously litigated;" and (3) awarding "a fixed amount of $150,000,000

per victim." *Thuneibat*, 167 F. Supp. 3d at 53–54 (BAH) (citation and quotation omitted)

(collecting cases).  In choosing among these methods and determining the appropriate

amount at which to set punitive damages, I consider four factors: (1) "the character of the

defendants' act," (2) "the nature and extent of harm to the plaintiffs," (3) "the need for

deterrence," and (4) "the wealth of the defendants." *Fraenkel v. Islamic Republic of Iran*,

892 F.3d 348, 354, 362 (D.C. Cir. 2018) (citation and quotation omitted).

All factors favor a significant award.  Syria provided material support to the Zarqawi

organization—a terrorist group known for committing violent atrocities.  Syria's support

ultimately helped enable brutal attacks against innocent civilians that resulted in severe

harm.  As a result, I find it necessary to deter Syria from supporting terrorist organizations

---

[10] In fact, there is an open question as to whether state law plaintiffs may receive punitive damages *at all* under the FSIA. *See Sheikh v. Republic of Sudan*, 485 F. Supp. 3d 255, 273 (D.D.C. 2020) (Bates, J.) (describing ongoing D.C. Circuit litigation over "whether punitive damages are available for claims proceeding under state law").

in the future.  And finally, the "defendant is a sovereign nation that can be presumed to possess significant wealth." *Sheikh v. Republic of Sudan*, 485 F. Supp. 3d 255, 273 (D.D.C. 2020) (Bates, J.).

In light of these considerations, I find it appropriate to award $150 million for each victim that was related to a plaintiff eligible to receive punitive damages, to be distributed among all eligible plaintiffs.  Regarding this method of calculating damages, plaintiffs' Motion for Default Judgment asks the Court for "$150 million in punitive damages to the estates of each of the five families (a total of $750,000,000)." Pls.' Mot. at 24.[11]  However, there are four estates before this Court—Lloyd Carl Fields Jr., James Damon Creach, Sean Copeland, and Brodie Copeland—from three of the five families.  Construing this ambiguous request consistent with the complaint, I interpret plaintiffs to be seeking $150 million for each victim with an affected family member before the Court, the total of which will be distributed across all eligible plaintiffs in proportion to their compensatory damages.  *See* Compl. ¶ 115 (requesting punitive damages for "each" plaintiff "to be shared among them in direct proportion to the other damages awarded to each of the [p]laintiffs").  Finding this method appropriate, I enter an award of punitive damages in the amount of

---

[11] Plaintiffs alternatively request that the Court award three to five times the amount Syria spends annually on terrorism, for a total of $1.5–3.5 billion. Pls.' Mot. at 24.  But this amount is even more than plaintiffs request in their complaint, Compl. (Prayer for Relief) (requesting $1 billion in punitive damages), and far exceeds punitive damages awarded in other cases against Syria, *see Thuneibat*, 167 F. Supp. 3d at 54 (BAH).  As such, application of the first approach would be unreasonable here. *See Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 106 (D.D.C. 2012) (citation and quotation omitted) (Lamberth, C.J.) (explaining that it is "appropriate to examine awards that courts have issued in similar state-sponsored terrorism cases" to allow a punitive damages award to be "reasonably predictable in its severity").

$750,000,000—$150,000,000 each for Lloyd Fields, Jr., James Damon Creach, Sean Copeland, Brodie Copeland, and Jared Tucker[12]—to be distributed among the plaintiffs suing under the federal cause of action, in proportion with their compensatory damages. *See Sheikh*, 485 F. Supp. at 273 (JDB) (distributing punitive damages among all plaintiffs eligible to receive punitive damages); *see also* Order and Judgment at 2, Wyatt v. Syrian Arab Republic, 908 F. Supp. 2d 216 (D.D.C. 2012) (No. 08-502) (Lamberth, C.J.) (same).

### E. Prejudgment Interest

Plaintiffs request prejudgment interest. Compl. (Prayer for Relief); Pls.' Mot. at 24-25. Prejudgment interest, however, is inappropriate here. Plaintiffs' economic damages are already calculated to reflect the value of damages in today's dollars. Weir Decl. ¶¶ 21, 25, 29, 33. "[T]herefore, a separate award of prejudgment interest would be duplicative." *Thuneibat*, 167 F. Supp. 3d at 54 (BAH) (citing *Roth*, 78 F. Supp. 3d at 407 (RCJ)). Likewise, plaintiffs' solatium damages do not typically require prejudgment interest because they are "designed to be fully compensatory." *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012) (Lamberth, C.J.); *see also Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 59 (D.D.C. 2012) (Lamberth, C.J.) (citation omitted) ("[W]hen this Court applies the *Heiser* damages framework—as it did in the underlying solatium award here—it has consistently refused to award prejudgment interest."). Finally, prejudgment interest does not apply to punitive damages because "'prejudgment interest is

---

[12] I decline to enter punitive damages for the death of Nohemi Gonzalez because, as explained above, her father—the only affected plaintiff—is ineligible to receive punitive damages.

an element of complete compensation' and punitive damages are non-compensatory."
*Thuneibat*, 167 F. Supp. 3d at 55 (BAH) (quoting *Wultz v. Islamic Republic of Iran*, 864 F.
Supp. 2d 24, 42 (D.D.C. 2012) (Lamberth, C.J.)).   Accordingly, I deny plaintiffs' request
for prejudgment interest.[13]

## CONCLUSION

For the foregoing reasons, plaintiffs' Motion for Default Judgment [Dkt. # 16] is
**GRANTED**.   Plaintiffs are entitled to the damages as set forth in detail in the attached
Appendix A – Damages, which total approximately $850 million.   An order consistent with
this decision accompanies this Memorandum Opinion.

**SO ORDERED.**

RICHARD J. LEON
United States District Judge

_____

[13] Plaintiffs' complaint seeks "reasonable costs and expenses" and "reasonable attorneys'
fees," Compl. (Prayer for Relief), but plaintiffs do not identify a source of law for these
claims and make no mention of these requests in their motion for default judgment.   *See*
Pls.' Mot.   Accordingly, I decline to award costs, expenses, and attorneys' fees.   *See Ewan*,
466 F. Supp. at 252–53 (citation and quotation omitted) (declining to award attorney's fees
and costs where plaintiffs did not "provide[ ] any information regarding the fees and costs
sought.").

Appendix A – Damages

| Plaintiff | Relation to Victim(s) | Economic | Solatium | Upward Departure | Punitive | Total |
|---|---|---|---|---|---|---|
| Tamara Fields | Wife | | $10,000,000.00 | $2,500,000.00 | $100,046,390.28 | $112,546,390.28 |
| Estate of Lloyd Carl Fields, Jr. | Estate | $5,206,968.25 | | | $41,675,070.22 | $46,882,038.47 |
| Heather Creach | Wife | | $10,000,000.00 | $2,500,000.00 | $100,046,390.28 | $112,546,390.28 |
| Estate of James Damon Creach | Estate | $8,263,322.39 | | | $66,137,246.15 | $74,400,568.54 |
| J. Creach (1) | Child | | $3,000,000.00 | $750,000.00 | $30,013,917.08 | $33,763,917.08 |
| J. Creach (2) | Child | | $3,000,000.00 | $750,000.00 | $30,013,917.08 | $33,763,917.08 |
| Reynaldo Gonzalez | Father | | $5,000,000.00 | $1,250,000.00 | | $6,250,000.00 |
| Kim Copeland | Wife & Mother | | $17,000,000.00 | $4,250,000.00 | $170,078,863.47 | $191,328,863.47 |
| Estate of Sean Copeland | Estate | $11,988,811.55 | | | $95,954,985.54 | $107,943,797.09 |
| Estate of Brodie Copeland | Estate | $3,247,427.09 | | | $25,991,468.64 | $29,238,895.73 |
| A. Tucker | Daughter | | $3,000,000.00 | $750,000.00 | $30,013,917.08 | $33,763,917.08 |
| O. Tucker | Daughter | | $3,000,000.00 | $750,000.00 | $30,013,917.08 | $33,763,917.08 |
| Isabella Tucker | Daughter | | $3,000,000.00 | $750,000.00 | $30,013,917.08 | $33,763,917.08 |

Grand Total   $ 849,956,529.28